## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEARCHMETRICS INC.,[1] | Case No. 17-11032 (XXX) |
| Debtor. | |

## DECLARATION OF WAYNE P. WEITZ IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Wayne P. Weitz, hereby declare under penalty of perjury:

1.        I am a Managing Director of EisnerAmper LLP ("**EisnerAmper**").  Searchmetrics Inc. (the "**Debtor**" or the "**Company**") retained EisnerAmper on February 21, 2017 to provide financial advisory and consulting services, as well as to provide me to serve in the role of Chief Restructuring Officer of the Company.   In such capacities, I am generally familiar with the Debtor's operations, business affairs, books, and records.   I am authorized to submit this Declaration on behalf of the Debtor.

2.        Except as otherwise indicated, all facts set forth in this declaration (the "**Declaration**") are based upon my personal knowledge, my discussions with members of the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's business, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.   If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

3.        I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records.   I submit this Declaration to assist the Court and parties in interest

---

[1]    The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Searchmetrics Inc. (1635). The mailing address for the Debtor, solely for purposes of notices and communications, is c/o EisnerAmper LLP, 750 Third Avenue, New York, New York 10017, *Attn*: Wayne P. Weitz.

in understanding the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of: (a) the Debtor's petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**").

4.      To familiarize the Court with the Debtor, the forces that caused the Debtor to commence this case and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized in five parts. Part I provides an introduction to the Company and detailed information on its corporate history and business operations. Part II provides an overview of the Debtor's organizational structure and capital structure. Part III describes the circumstances leading to the commencement of this Chapter 11 Case. Part IV sets forth the Debtor's strategy for this Chapter 11 Case. Part V sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case.

## PRELIMINARY STATEMENT[2]

5.      The Debtor is wholly-owned by Searchmetrics GmbH ("**GmbH**" and together with the Debtor "**Searchmetrics**"). The Debtor is a pioneer and leading search engine optimization ("**SEO**") service provider in the United States. GmbH has made a determination to restructure the Debtor consistent with the terms of the proposed Plan or to liquidate the Debtor.

6.      One of the Debtor's primary competitors in the U.S. market is BrightEdge Technologies, Inc. ("**BrightEdge**"). Brightedge sought to acquire or merge with Searchmetrics in or about October of 2013. During acquisition discussions, BrightEdge became privy to Searchmetrics' confidential, proprietary, competitive information and business practices,

---

[2]    Capitalized terms used in this Preliminary Statement shall have the meanings set forth below.

including its business model and growth plans.  Ultimately, Searchmetrics and BrightEdge could not agree on terms and the acquisition discussions fell apart.

7.      Unbeknownst to Searchmetrics, whilst in the midst of the acquisition discussions, BrightEdge developed a campaign to eliminate the Debtor's presence in the U.S. market. BrightEdge started by engaging in a smear campaign designed to lure the Debtor's customers and prospective customers to BrightEdge by making false and disparaging statements about Searchmetrics' products, and then initiated vexatious, baseless, and prolonged litigation against the Debtor on two fronts.  This Chapter 11 Case was initiated to bring the BE Litigation to an expeditious and cost-effective end to permit the Debtor to reorganize, failing which, the Debtor will be liquidated.

8.      First, BrightEdge initiated the State Court Litigation in November 2013, alleging a host of claims against its former employee and then current employee of the Debtor, Gabriel Martinez.  Seventeen months later, in April 2015, BrightEdge amended the lawsuit to add the Debtor.  After the pleading stage, only claims for misappropriation of alleged compilation trade secrets and conspiracy remained.

9.      Second, BrightEdge sought and was granted patents for certain software abstract ideas, some of which have been used for years before BrightEdge's patents.  BrightEdge then sued Searchmetrics for infringing those patents in March 2014.  Upon information and belief, BrightEdge has not pursued any other persons, entities, or competitors for infringing those patents.

10.     Throughout the State Court Litigation, BrightEdge has employed every delay tactic possible to drag out the case and cause the Debtor to incur the greatest possible costs and expenses. Indeed, the State Court Litigation has been actively ongoing since November 2013 with no trial date or end in sight.  Prior to being added as a party to the suit in April 2015, the Debtor incurred

substantial costs and faced serious business distraction (a) relating to its employee being involved in the lawsuit, and (b) defeating an overly broad and unsupportable subpoena from BrightEdge, which BrightEdge did not even seek to enforce until *after* the statutory deadline to do so had passed. Also, although the claims asserted in the State Court Litigation and Patent Litigation are unrelated, the Debtor agreed to stay the Patent Litigation, although at the time not understanding that BrightEdge's motivation was to drag out the State Court Litigation as long as possible and then, after the State Court Litigation concluded in another three or so years, restart the Patent Litigation, thereby keeping the Debtor submerged in litigation for the better part of a decade, if the Debtor could financially withstand the attack. While BrightEdge fought to keep the Patent Litigation stayed until the end of the State Court Litigation, the judge in the Patent Litigation just lifted the stay in the case on May 2, 2017 and ordered that all discovery may proceed. Just one day after the stay was lifted, BrightEdge demonstrated its intent to force the Debtor to incur maximum costs by pursuing overbroad and harassing discovery of Searchmetrics while BrightEdge attempts to continue to delay ultimate resolution of the Patent Litigation. First, BrightEdge notified Searchmetrics of its intent to re-file overbroad discovery motions in the patent case on May 5, 2017. Second, Searchmetrics seeks to file a motion that it expects will dispose of the Patent Litigation in its entirety and result in massive reduction in litigation costs. However, BrightEdge's position is that Searchmetrics may not file its motion until August 2017, yet BrightEdge expects to pursue its unduly burdensome discovery now.

      11.     Put simply, BrightEdge has been trying to spend and otherwise put the Debtor out of business since the end of 2013 when it was unable to advance a low-ball acquisition strategy. Unfortunately, BrightEdge's endless scorched-earth litigation strategy will prove successful unless

the Debtor is able successfully to prosecute confirmation of a plan, the cornerstone of which is the estimation of BrightEdge's claims for all purposes.

12.    Since BrightEdge commenced the BE Litigation, the Company has incurred defense costs of approximately $2 million annually, and it anticipates that absent the filing of this Chapter 11 Case and the imposition of the automatic stay, the Company would spend between $3 and $4 million just in 2017 in connection with just the State Court Litigation and would likely spend at least another $1 million in 2017 in the Patent Litigation. Absent the expeditious resolution of the BE Litigation under the protection of chapter 11, the Debtor will be forced to terminate all of its employees and liquidate.

13.    The Debtor also attempted, without success, to settle the BE Litigation using one of the most preeminent mediators in the United States, Antonio Piazza, on April 12, 2017. Searchmetrics has also pursued direct discussions between its board and the BrightEdge board to resolve the matter, which has also been rebuffed.

14.    Through this Chapter 11 Case, the Debtor seeks to implement a plan that will result in creditors being paid 100% of their allowed claims, while enabling the Debtor to emerge from chapter 11 with the ability to save its business and the livelihood of its employees.

## I.

### DESCRIPTION OF THE DEBTOR'S CORPORATE HISTORY AND BUSINESS OPERATIONS

15.    GmbH was founded in 2005 in Germany by Marcus Tober, the Company's Chief Technology Officer and President. GmbH is a leading provider of SEO technology and services. GmbH, the Debtor's direct parent, owns all of the intellectual property and provides certain of the services related to the SEO platform (the "**SEO Platform**"). The Debtor was formed in 2010 and

distributes the SEO Platform and provides consulting services to customers in North America, South America, and Australia.

16.     The SEO Platform has the largest global reach of any SEO platform.  Through the SEO Platform, the Debtor offers access to services such as site structure optimization, content optimization, visibility guard, content performance, traffic conversion and forecasting, all of which help increase the visibility and relevance of its customers' online presence.  One of the many things that sets the SEO Platform apart from that of the Debtor's competitors, is that GmbH mines its own data instead of purchasing all of its data from third-party providers and maintains its data with a ten-year lookback.  This enables the Debtor to provide its customers with over 250 billion pieces of information, such as keyword rankings, search terms, social links, and backlines.  The SEO Platform provides information relating to global, mobile, and local data covering organic and paid searches, as well as search media, and allows its customers to forecast revenue contributions from search, social, and content marketing, and track incremental revenue changes as marketing initiatives are refined based on customers' use of the SEO suite.

17.     The SEO Platform allows customers to experience optimization in the marketplace, which makes digital marketing more effective, faster, and more profitable.  This enables the Debtor's customers to reach the right prospects and customers with the right message, increase content relevance, which in turn enables its customers to make more informed purchasing decisions and boost the Debtor's customers' profit margins.  In addition, the Debtor offers product packages that are designed to fit the unique needs of each customer.  This, together with the superiority of the product and the talent of its sales and consulting forces, has made Searchmetrics a leader in the industry, with its SEO Platform consistently winning industry awards. The Debtor's customers include trailblazing companies, including several large public companies.

## II.

## THE DEBTOR'S ORGANIZATIONAL
## AND CAPITAL STRUCTURE

18.     The Debtor is a privately held Delaware corporation and wholly-owned subsidiary of GmbH.  Commencing in 2010, GmbH extended credit to the Debtor on an unsecured basis through that certain *Intercompany Loan Agreement*, dated as of July 1, 2010 (as amended, modified, supplemented, restated or replaced from time to time, the "**Unsecured Loan Agreement**").   Thereafter, GmbH made additional unsecured loans to the Debtor through amendments to the Unsecured Loan Agreement to fund operations and offset the costs of the BE Litigation.

19.     In addition to being parties to the Unsecured Loan Agreement, the Debtor and GmbH were parties to that certain *Framework Purchase Agreement*, dated July 5, 2010 (as amended, modified, supplemented, restated or replaced from time to time, the "**FPA**").   Under the FPA, the Debtor purchased access to the SEO Platform from GmbH, which the Debtor in turn sold to customers in its designated markets.

20.     The Debtor never operated profitably, despite increased sales year over year.  In early 2016, the Debtor undertook certain cost-saving strategies in an effort to lower expenses. Unfortunately, these methods proved insufficient in light of the enormous costs the Debtor was forced to incur in connection with defending the BE Litigation.  Subsequently, GmbH's board of directors determined that it would not and could not continue to fund the operating expenses of the Debtor or the defense costs attendant to the BE Litigation.

21.     On January 12, 2017, GmbH issued to the Debtor a notice of default (the "**Default Notice**") under the Unsecured Loan Agreement and the FPA. The Company interviewed professionals to assist it in its reaction to the notice of default served by GmbH and ultimately,

hired EisnerAmper to provide me as the Chief Restructuring Officer to the Debtor. The Debtor retained Chipman Brown Cicero & Cole, LLP to serve as bankruptcy counsel in connection with this Chapter 11 Case.

22.     The Debtor determined that continuing the engagement of DLA Piper LLP (US) to serve as special litigation counsel to the Debtor would minimize costs and maximize value for the benefit of Debtor's estate. Continuing with DLA Piper's engagement as special counsel in the Chapter 11 Case will permit the Debtor to benefit from the several years of knowledge and experience in the BE Litigation that the Debtor cannot replicate under the time constraints in this Chapter 11 Case at any cost.

23.     Debtor's counsel and I negotiated a forbearance agreement with GmbH (the "**Forbearance Agreement**"), which was executed by the parties thereto as of February 28, 2017. As of December 31, 2016, the Debtor owed GmbH not less than €9,512,396.70 under the Unsecured Loan Agreement, comprising €8,756,878.63 in principal and €755,518.06 in accrued and unpaid interest, and not less than €5,331,480.46 under the FPA; thus, the Debtor was indebted to GmbH in the aggregate amount of not less than €14,843,877.15, plus an amount not less than €187,000 under the Unsecured Loan Agreement borrowed in 2017 (the "**GmbH Unsecured Claim**").

24.     In exchange for GmbH's agreement not to exercise its remedies against the Debtor in connection with the GmbH Unsecured Claim, but more importantly, to induce GmbH to continue to fund the Debtor to bridge to and through this Chapter 11 Case, and to permit the Debtor to continue to distribute the SEO Platform, the Debtor agreed to revise certain terms and conditions respecting its relationship with GmbH, including: (a) entering into a multiple draw secured loan

facility, which would be rolled into a debtor in possession financing facility and (b) entering into a new agreement covering the Debtor's purchase of access to the SEO Platform.

25.    Contemporaneously with the negotiation of the Forbearance Agreement, the Debtor, through myself and its counsel, and GmbH, through its business persons and counsel, negotiated and entered into that certain *Loan and Security Agreement* (the "**Prepetition Secured Debt Facility**") dated as of February 28, 2017, to be reaffirmed, ratified and amended by the Debtor and GmbH by that certain *Master Reaffirmation, Ratifications and First Amendment to Loan and Security Agreement* (the "**Reaffirmation Agreement**") and that certain *Non-Exclusive Distributor Agreement* (the "**Distributor Agreement**"), also dated as of February 28, 2017. GmbH and the Debtor will execute the Reaffirmation Agreement whereby the Debtor will: (i) acknowledge and agree that the Prepetition Secured Debt Facility, and the liens and security interests granted and issued thereunder, secure the Prepetition Secured Obligations of the Debtor; and (ii) ratify the Prepetition Secured Obligations upon entry of the Final Order to convert them to DIP Obligations.

26.    Under the Prepetition Secured Debt Facility, GmbH committed to provide an additional new money secured loan of up to €4,325,000. As of the Petition Date approximately €1,429,406 was outstanding under the Prepetition Secured Debt Facility. The Prepetition Secured Debt Facility is collateralized by all of the Debtor's assets and properties, including its counterclaims against BrightEdge, its customer contracts and all receivables therefrom, and all other cash, inventory, and equipment. As of the Petition Date, the Prepetition Secured Debt Facility represented the Debtor's only secured debt. In addition, the Debtor has obligations owing to its vendors, employees, GmbH, and other parties, including BrightEdge's asserted unliquidated and contingent claims.

27.     Through the postpetition ratification of the Prepetition Secured Debt Facility, the Debtor will agree to achieve certain milestones in the Chapter 11 Case, including, but not limited to: (a) filing a plan of reorganization and related disclosure statement on the Petition Date, (b) filing a motion to approve the DIP Facility provided by GmbH (the "**DIP Lender**"), pursuant to the terms of a debtor in possession financing agreement and a DIP Lender-approved budget (the "**DIP Facility**"), (c) obtaining interim approval of the DIP Facility within three (3) business days of the Petition Date and final approval of the DIP Facility within thirty (30) days of the Petition Date, (d) staying all litigation against the Debtor, except with respect to any proceedings before the Court in the Chapter 11 Case, (e) obtaining approval of the Court of the disclosure statement within sixty-five (65) days of the Petition Date, and (f) obtaining entry of an order of this Court confirming the plan within one hundred twenty (120) days following the Petition Date (collectively and together with the other covenants set forth in the Forbearance Agreement, Prepetition Secured Debt Facility and Distributor Agreement, the "**Milestones**").

28.     In addition to the Prepetition Secured Debt Facility, as of the Petition the Debtor has unsecured trade debt in the approximate aggregate amount of $2 million, the GmbH Unsecured Claim in the amount of €14,843,877.16 as of December 31, 2016, and the unsecured, contingent, unliquidated, and disputed litigation claims asserted by BrightEdge.

### III.

### CIRCUMSTANCES LEADING TO THE
### COMMENCEMENT OF THIS CHAPTER 11 CASE

29.     As noted above, as of the Petition Date, the Debtor was embroiled in contentious and vexatious litigation initiated by BrightEdge in an effort to spend the Debtor out of the U.S. market after BrightEdge's failed attempt to purchase or merge with Searchmetrics in October 2013. As noted above, Searchmetrics attempted to mediate a resolution of the BE Litigation in the

weeks preceding the Petition Date. The mediation failed and due to the confidentiality of the mediation, the Debtor can say nothing further about it. Since it is extremely unlikely that any consensual resolution of the BE Litigation is possible, absent the filing of this Chapter 11 Case and the exit strategy provided for in the Plan, the Debtor could have been forced to shutter its doors during the first quarter of 2017. As described below, the Debtor does not believe that BrightEdge's claims have any merit or value, and the Debtor simply could not afford, literally and figuratively, to continue to suffer at the hands of BrightEdge's schemes and tactics.

A.    **Prepetition State Court Litigation**

30.    In late 2013, BrightEdge sought to acquire or merge with Searchmetrics. In October 2013, the parties discussed Searchmetrics' confidential, proprietary technology and intellectual property in detail. Searchmetrics proposed a purchase price. BrightEdge proposed to pay half of the purchase price in cash and the other half in BrightEdge stock. Questioning the value of BrightEdge's stock and other associated risks, Searchmetrics demanded a sizeable premium on the stock component of the proposed transaction. BrightEdge would not offer a premium on the stock component, the transaction fell through, and BrightEdge modified its acquisition strategy by filing a lawsuit, employing scorched-earth litigation tactics, and defaming the Company's products to the marketplace through its "Sideswipe" program, all in an effort to eliminate Searchmetrics.

31.    On or around April 8, 2013, prior to any acquisition or merger discussions, a BrightEdge employee, Gabriel Martinez, gave notice that he was leaving its employ. Mr. Martinez had been identified by one of several third-party recruiters retained by the Debtor.

32.     Mr. Martinez joined the Debtor on or around April 22, 2013, pursuant to the terms of an employment agreement he signed on April 3, 2013.  Among other things, the employment agreement confirmed:

> You understand and agree that by accepting this offer of employment, you are representing to the [Debtor] that your performance will not breach any other agreement to which you are a party...You are not to bring with you to the [Debtor], or use or disclose to any person associated with the [Debtor], any confidential or proprietary information belonging to any former employer or other person or entity with respect to which you owe an obligation of confidentiality under any agreement or otherwise.

33.     On May 4, 2013, before M&A discussions began, counsel for BrightEdge sent a letter to Mr. Martinez accusing him of improperly taking voluminous amounts of proprietary BrightEdge files and demanding answers to several questions.  The letter noted that BrightEdge had preserved the records of Mr. Martinez's alleged theft and that there was no use in Mr. Martinez attempting to delete the files now (BrightEdge has since lost or spoliated these records).  BrightEdge did not file a lawsuit, much less seek a temporary restraining order or other form of preliminary relief.

34.     A few days later on May 7, 2013, counsel for BrightEdge wrote to the Debtor expressing some concerns it had about Mr. Martinez allegedly bringing BrightEdge proprietary material to the Debtor, while stressing that BrightEdge was not accusing the Debtor of any wrongdoing.  The Debtor responded the next day that, to its knowledge, the Debtor did not have any BrightEdge proprietary information.

35.     The M&A discussions did not begin until late summer of 2013. The M&A discussions began after a private equity fund chose to directly invest over $40 million in BrightEdge in June 2013, instead of Searchmetrics, and then suggested that the companies consider some form of M&A.

36.     *Just days after the potential M&A talks ended*, on October 31, 2013, counsel for BrightEdge sent a follow-up letter to counsel for Mr. Martinez, accusing Mr. Martinez of using BrightEdge trade secrets to win business for the Debtor.  BrightEdge did not send a copy of the letter to the Debtor.

37.     On November 26, 2013, BrightEdge filed a lawsuit in the Santa Clara Superior Court against only Mr. Martinez (the "**State Court Litigation**") and served him on the evening of November 27, the night before Thanksgiving.

38.     Four months later in March 2014, BrightEdge sued the Debtor and GmbH in the Northern District of California for patent infringement (the "**Patent Litigation**," and together with the State Court Litigation, the "**BE Litigation**").

39.     Certain of the technology in BrightEdge's patents had been developed or used long before BrightEdge had ever sought a patent.  The Patent Litigation was stayed in late 2014 pending reexamination of the Patents-in-Suit by the patent office.  The reexamination concluded in 2015, but, as described in more detail below, the Patent Litigation has remained stayed, as it appears BrighEdge has no desire to litigate the matter and risk having its patents invalidated.  To wit, in a *Joint Case Management Conference Statement* filed in the Patent Litigation on April 25, 2017, BrightEdge requested that the Patent Litigation remained stayed pending the outcome of the State Court Litigation until late 2017 or early 2018, and proposed a schedule where the court trying the Patent Litigation will not be in a position to rule on the merits of an invalidity motion – following a recent change in software patent law based on a United States Supreme Court decision – until April of 2018 at the earliest, and that is only if all goes according to BrightEdge's proposed schedule.

40.    In June 2014, the United States Supreme Court issued its decision in *Alice v. CLS Bank*, 134 S. Ct. 2347 (2014), which, as I understand, greatly narrowed the patentability of software and set the stage for invalidating abstract software patents like BrightEdge's. Given the nature of the reexamination proceedings, an *Alice* challenge was not included.

41.    In April 2015, BrightEdge filed an amended complaint in the State Court Litigation, adding the Debtor and two additional individuals – Shaun Siler and Cullen McAlpine – as defendants. Cullen McAlpine, another former BrightEdge employee, joined the Debtor in September 2013. McAlpine too was recruited to the Debtor by a third-party recruiting company, and he too signed the Debtor's standard employment agreement quoted above.

42.    Following extensive motion practice in the State Court Litigation, all that remains of BrightEdge's State Court Litigation against the Debtor is a trade secret misappropriation claim based on fifteen (15) documents and a conspiracy liability claim, which, as I understand, must be limited to pre-employment conduct involving Mr. Martinez and Mr. McAlpine. I understand that as a matter of law, employees cannot conspire with their employer. There are no facts establishing any pre-employment conspiracy, which should be obvious to BrightEdge now since it knows from discovery that both Mr. Martinez and Mr. McAlpine were recruited by a third-party recruiting firm. All other claims BrightEdge asserted or sought to assert against the Debtor were disposed of based on trade secret preemption.

43.    The State Court Litigation should be a very narrow, focused lawsuit. But it is not, by BrightEdge's design.

44.    Fourteen (14) of BrightEdge's alleged fifteen (15) trade secrets at issue are compilations of customer information from its "Salesforce" database. These trade secrets are part of the same fact-sets that BrightEdge publishes on its website as part of its marketing campaign in

the form of customer testimonials and other marketing ploys. The alleged trade secret information is also otherwise readily ascertainable from Internet searches on Google, LinkedIn, Facebook, Twitter, and YouTube. Likewise, third party marketing firms can provide the same data for little or no cost. *See* *e.g.* https://discovery.hgdata.com/product/brightedge and https://trends.builtwith.com/analytics/BrightEdge/United-States. Additionally, BrightEdge provides its sales team members a plaque including a copy of the person's first sales contract, which includes all the details of the deal consummated (price, duration, key contact information, *etc.*). Mr. McAlpine displayed his plaque on his wall at home. The other alleged trade secret is a BrightEdge comparison to Searchmetrics, which addresses information BrightEdge freely shares as a part of its marketing and sales pitch.

45.    BrightEdge claims that this information constitutes its trade secrets, irrespective of the availability of nearly all of the information publicly for no or *de minimis* cost and/or being publicly disseminated by BrightEdge itself and easily compiled or "scrapped" from the Internet.

46.    BrightEdge has identified 634 companies it claims the Debtor obtained as customers using these alleged trade secrets. However, BrightEdge now knows, of these 634 companies, only roughly 100 became new customers to Searchmetrics after the alleged misappropriation occurred when Mr. Martinez joined the Debtor. BrightEdge has not identified any lost profit related to any of these companies, which I understand is the legally recognizable measure of damages as described in more detail below, and has outright refused to provide discovery necessary to calculate any alleged lost profit. In depositions conducted by BrightEdge, employees and former employees of the Debtor have provided more than a dozen examples of how the Debtor obtained the business in question from companies within this roughly 100-company set, which have absolutely no nexus to the use or possession of any alleged BrightEdge trade secret.

BrightEdge has stopped taking depositions. It had scheduled deposition dates in 2017 for Mr. McAlpine, Mr. Siler, and Mr. Martinez, confirmed by the deponents, but then BrightEdge did not notice or conduct these depositions. The parties made arrangements for BrightEdge to depose Mr. Tober in Berlin in April, but BrightEdge did not seek to obtain or obtain the necessary approvals of the German authorities to be able lawfully to conduct the deposition and the deposition had to be cancelled. Instead, BrightEdge seeks irrelevant and costly discovery such as discovery on another 350+ companies, none of which *BrightEdge* even claims are new customers to the Debtor that the Debtor engaged during the relevant time period (May 2013 to the present), but will cost the Debtor an estimated $500,000.00 to collect, review, and produce.

47.    In the State Court Litigation, the Debtor asserted defamation-related counterclaims against BrightEdge and its CEO, Jim Yu, and its Vice President for Business Development, Tom Ziola. The Debtor first learned of these bad acts when some of Debtor's customers and potential customers forwarded to the Debtor emails from BrightEdge making statements about the Debtor's technical capabilities that BrightEdge knew to be false. Messrs. Yu and Ziola made similar statements and orchestrated BrightEdge's overall scheme as part of its "Sideswipe" program. The specific purpose of "Sideswipe" is to "rip" customers away from competitors such as the Debtor and have them "replace" the competitors' product with BrightEdge's product. Before filing its counterclaims based on this conduct against BrightEdge in the State Court Litigation, the Debtor sent BrightEdge a cease and desist letter. BrightEdge's response was to deny any wrongdoing even though the Debtor was in possession of BrightEdge's emails to the Debtor's customers that corroborated the statements the Debtor set forth in the cease and desist letter, and to continue on with Sideswipe using false and defamatory statements.

48.    BrightEdge also demanded that the Debtor agree to have the State Court Litigation transferred to the Complex Division of the Santa Clara Superior Court, which would have the matter proceed before just one judge from start to finish and allow for other procedural benefits. However, shortly after BrightEdge made this demand, the sole Complex Division judge sanctioned a plaintiff for bringing and maintaining a trade secret lawsuit in bad faith, an order that was upheld by the California Court of Appeal for the Sixth District.  Thereafter, BrightEdge *opposed* the Debtor's motion for complex designation, going directly against an agreed course of action, not for the last time.  As another example of wasteful vexatious litigation, BrightEdge served discovery respecting a party's request to adjust or extend dates.  More specifically, shortly after counsel for Mr. Martinez requested an extension due to prearranged travel, BrightEdge served discovery requests asking for copies of travel documents.

49.    BrightEdge is using its baseless lawsuit as a means to spend the Debtor out of business.  Scorched-earth discovery has taken over the State Court Litigation.  The Debtor has reviewed over 13 terabytes of data for production in response to 400 requests for production and produced nearly 6 terabytes of data.  1 terabyte is 1,000 gigabytes or 1,000,000 megabytes.  As I understand, 1 terabyte of Word files is roughly 89,000,000 pages.  Subject to strict confidentiality requirements, the Debtor has produced wholesale 17 electronic storage devices and copies of devices (laptops, cell phones, external hard drives, *etc.*) and produced more than 1,000,000 files from its SugarCRM database.

50.    As of the Petition Date, the State Court Litigation will have been pending for nearly three and half years, with no trial date or discovery deadline set or end in sight.  Conceivably, based on what has happened in the State Court Litigation thus far (and the Debtor believes this to be BrightEdge's strategy in the State Court Litigation), the State Court Litigation could drag on

for another several years and with several million dollars in expenses concluding with a finding that BrightEdge has no trade secrets and certainly no recoverable trade secrets damages.

51.    Both Mr. Siler and Mr. Martinez have filed individual voluntary petitions for relief under chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California.  As reflected in the chapter 13 plans and other information filed by Mr. Siler and Mr. Martinez, both are woefully insolvent, and yet, BrightEdge is still pursuing them both in the State Court Litigation and filed a proof of claim in each of their bankruptcy cases (but no adversary proceeding and no request for exemption from discharge).   BrightEdge was able to have the stay lifted as to Mr. Siler, but not as to Mr. Martinez.  Mr. Siler's chapter 13 bankruptcy plan has been confirmed with minimal monthly payments, none of which, as I understand, will be distributed to BrightEdge.  Nevertheless, BrightEdge still pursues Mr. Siler.

52.    Until only recently, BrightEdge made no damage demand to any party, claimed generally that its State Court Litigation claims were worth more than $100 million.  On December 29, 2016, BrightEdge filed substantively identical proofs of claim for $34 million in each of the Siler and Martinez bankruptcy cases, which attached a copy of the State Court Litigation complaint (the "**State Court Damages Claim**").   The State Court Damages Claim was signed by BrightEdge's in-house counsel under penalty of perjury.  The $34 million claim amount alleged in the State Court Damages Claim is declared by BrightEdge to be all damages flowing from the State Court Litigation and is calculated as follows:

- $8,554,074 for lost *revenue* from May 2013 to June 2018;

- $1,464,169 for prejudgment interest;

- $1,466,787 for lost *revenue* from June 2018 to June 2019;

- $22,743,716 for exemplary damages; and

- 18 -

      ■  Less $113,172 as a discount against future damages.

53.     Based upon my review of the State Court Damages Claim, verified by BrightEdge's in-house counsel under penalty of perjury, BrightEdge's representation that the State Court Damage Claim represents all damages caused by the claims covered by the State Court Litigation, the Debtor anticipates that the State Court Damages Claim will also be asserted against the Debtor; the Debtor can conceive of no basis that BrightEdge may assert a claim separate and apart from or in addition to the State Court Damages Claim against the Debtor.

54.     Critically, in a trade secrets case such as the remaining claims in the State Court Litigation against the Debtor, I understand that there are only three types of actual damage recognized by the courts. The first is the plaintiff's *lost profit -- not lost revenue*. The second is the defendant's ill-gotten profit – again, *not revenue*. If the plaintiff and defendant have no profits, then a reasonable royalty can be awarded under certain circumstances. Here, BrightEdge has not claimed lost profit in its State Court Damages Claim and, as noted above, the Debtor has failed to turn a profit. Further, the law provides that there can be no reasonable royalty attributed to information readily available to the public and widely disseminated by BrightEdge. Finally, exemplary damages are available only in very limited circumstances (willful and malicious conduct, for which there is no supporting evidence in this case) and capped at two times actual damages. As the actual damages that may be awarded to BrightEdge in the State Court Litigation likely amount to $0, exemplary damages are not available. To be more specific, to my knowledge, BrightEdge has never claimed or identified any lost profit and refused to respond to lost profit-related discovery, claiming that the inquiry is irrelevant. Based on simple math, which is based on assumption as BrightEdge refused to provide discovery, it appears that BrightEdge's maximum *lost revenue* figure over the alleged relevant time period is no more than $1.5 million (approximately $9.9 million of claimed lost revenue identified above divided by 634 companies

identified by BrightEdge, provides an average lost revenue per customer of roughly $15,000.00.

$15,000.00 multiplied by the roughly 100 potentially relevant customers equals $1.5 million of

potential lost *revenue*). Even if BrightEdge has a 75% profit margin, which it certainly does not,

this would mean no more than $1.1 million of lost profit. And, to date, BrightEdge has not even

attempted to demonstrate the causal link of use or existence of any alleged BrightEdge trade secret

to any recoverable damages. The Debtor is confident that if it had the burden of proof, which it

does not, based on the current record (*i.e.*, no BrightEdge depositions regarding its claims and no

third-party discovery as to why a company in question dumped or did not select BrightEdge) the

Debtor could disprove all, but possibly less than $100,000.00 of lost revenue in question, which

would equate to no more than $75,000.00 of lost profit.

56.    Further, I understand that as a matter of law, there can be no damages for a

conspiracy liability claim; a conspiracy liability claim simply extends liability for some other

actionable wrong committed by one party to the co-conspirator. Here, the only alleged actionable

wrong is trade secret misappropriation.

56.    Given the volume and frequency of discovery disputes, in November 2015 the state

court law and motion judge issued an order appointing a discovery referee for the purpose of

streamlining and expediting the discovery dispute resolution process. Unfortunately, the

objectives of the appointment order have not been met and in fact the opposite has resulted,

including a three to four-month process from the time discovery is served until a substantive

response is provided. Consider the following conservative illustration of the discovery process.

| Day 1 | Propounding party serves discovery request |
|---|---|
| Day 30 | Responding party serves objections to discovery requests |
| Days 31 to 45 | Parties meet and confer regarding discovery requests and objections. |
| Day 46 | Discovery motion filed with the discovery referee. |
| Day 76 | Discovery referee hears dispute |
| Day 80 | Discovery referee issues recommendation to state court law and motion judge. |
| Day 90 | Parties file objections and cross-motions to state court law and motion judge asking to set aside and/or adopt the discovery referee recommendation. |
| Day 120 | State court law and motion judge hears motions. |
| Day 130 | Parties receive state court law and motion judge's order, which requires compliance within 30 days. |
| Day 160 | Responding party serves substantive discovery responses. |
| Day 165 | Propounding party notes deficiencies and cycle repeats. |

57.     To date the discovery referee has issued twenty-one (21) reports, nearly all of which have been challenged in whole or in part.  Of the challenged reports, nearly all have been set aside at least in part by the state court law and motion judge.  With respect to the proof of claim and lost profit discovery, the parties are in the Day 31 to 45 meet and confer phase, which means, without an expedited Chapter 11 adversary proceeding and claims estimation process, the State Court Lawsuit would proceed for another 3 months without BrightEdge confirming it does not have any lost profit, which means summary judgement will then be appropriate.  During those 3 months, the Debtor will likely spend at least $750,000.00, it does not have, trying to advance the lawsuit to resolution.

58.     In short, because BrightEdge could not buy or otherwise acquire the Debtor on the cheap, BrightEdge chose to attack the Debtor with litigation that had no realistic ability of

recovering any damages – the definition of baseless litigation – with the apparent sole purpose of driving the Debtor out of business and swooping in to capture the Debtor's market share, thereby achieving the ultimate "Sideswipe" victory.

59.    As of the Petition Date, no date for trial has been set in connection with the State Court Litigation and there are currently no dispositive motions upon which decisions are pending. Based upon the record of events to date, including the failed April 12, 2017 mediation, and the fact that no trial date has been set, I anticipate that the State Court Litigation, including appeals, may continue for at least the next three years, at a minimum.

**B.    <u>Prepetition Patent Litigation</u>**

60.    In March 2014, BrightEdge sued the Debtor and GmbH in the Northern District of California for patent infringement of five patents: US Patent Nos. 8,135,706 (the "**'706 patent**"), 8,478,700 (the "**'700 patent**"), 8,478,746 (the "**'746 patent**"), 8,577,863 (the "**'863 patent**") and 8,671,089 (the "**'089 patent**" and collectively, the "**Patents-in-Suit**" and the "**Patent Litigation**," as applicable).    BrightEdge subsequently served a second amended complaint to which Searchmetrics filed an answer on June 5, 2014, denying the infringement allegations for each of the Patents-in-Suit and raising affirmative defenses including failure to state a claim, non-infringement of each of the Patents-in-Suit, invalidity of each of the Patents-in-Suit, prosecution history estoppel with respect to each of the Patents-in-Suit, damages limitations, and patent marking.

61.    Searchmetrics has alleged that the Patents-in-Suit are invalid for at least three distinct reasons.    First, as referenced above, Searchmetrics has alleged the claims under the Patents-in-Suit are directed to patent ineligible subject matter under *Alice v. CLS Bank*, 134 S. Ct. 2347 (2014).  I understand that publicly available statistics state that roughly in the two years since

the *Alice* decision (to June 2016), courts have issued 287 total decisions on patent eligibility under section 101, invalidating patents 70% of the time.  Robert R. Sachs, "TWO YEARS AFTER ALICE: A SURVEY OF THE IMPACT OF A 'MINOR CASE'", Fenwick & West's Bilski Blog (June 16, 2016), http://www.bilskiblog.com/blog/2016/06/two-years-after-alice-a-survey-of-the-impact-of-a-minor-case.html.  *See* **Exhibit A**.

62.    Second, Searchmetrics alleged in the Patent Litigation that the technology claimed by the '700 patent, the '706 patent and the '746 patent was used long before BrightEdge ever sought to patent such technology, which means that this prior use legally invalidates the '700 patent, the '706 patent and the '746 patent.  Third, Searchmetrics has alleged in the Patent Litigation that the Patents-in-Suit are invalid in view of "prior art" under applicable law.  Searchmetrics has further alleged it does not practice the claims of any of the Patents-in-Suit.  Thus, BrightEdge's claims in the Patent Litigation have no legally cognizable value, and serve only to further bury the Debtor in litigation.

63.    In 2014, Searchmetrics filed a request for *inter partes* review ("**IPR**") on three of the Patents-in-Suit, asking the Patent Trademark and Appeals Board ("**PTAB**") to institute a review of the validity of those three patents in light of certain earlier written publications.  The Patent Litigation was then stayed.  As I understand, the IPR process may only be used to review validity in light of other patents and publications and may not be used to challenge a patent as being invalid under *Alice*.  While the PTAB decided to not review the validity of the three patents in light of the certain earlier written publications, I understand that the PTAB did not hear anything about or make any decisions regarding Searchmetrics' other invalidity defenses (*i.e.*, unpatentable subject matter, prior use by both Searchmetrics and other third parties, and written publications other than the specific references considered by the PTAB).

64.    While the Patent Litigation was active, BrightEdge employed the same litigation tactics they used in the State Court Litigation, including having served onerous discovery requests and engaged in overly aggressive motion practice. By way of example, BrightEdge aggressively sought to avoid the Northern District of California's Order for Discovery of Electronically Stored Information for Patent Cases, which greatly limits the scope of e-discovery and reigns in unnecessary costs. Despite BrightEdge's repeated requests, the Court ruled that the Model Order applied. Nevertheless, in response to the allowed discovery, Searchmetrics produced nearly 430,000 pages of documents in response to BrightEdge's requests while the Patent Litigation was active.

65.    As noted, BrightEdge had requested that the Patent Litigation be stayed until the State Court Litigation was fully adjudicated, even though the claims at the center of the Patent Litigation and the claims at the center of the State Court Litigation have no bearing upon, or connection with, each other. At the time Searchmetrics agreed to the stay, Searchmetrics had not unraveled the machinations backstopping BrightEdge's true intention in seeking to stay the Patent Litigation – to draw out the State Court Litigation and then restart the Patent Litigation, in an attempt to keep the Debtor in contentious, vexatious, expensive, and seemingly never-ending litigation. As such, at the time Searchmetrics agreed to an extended stay of the Patent Litigation. As noted above, as recently as May 2, 2017, BrightEdge reconfirmed its desire keep the stay in place over Searchmetrics' objection to lift the stay and file an *Alice* motion immediately.

66.    On May 2, 2017, despite BrightEdge's request to keep the Patent Litigation stayed until the end of the State Court Litigation, the judge in the Patent Litigation just lifted the stay and ordered that all discovery may proceed. Just one day after the stay was lifted, BrightEdge demonstrated its intent to force the Debtor to incur maximum costs by pursuing overbroad and

harassing discovery of Searchmetrics while attempting to continue to delay ultimate resolution of the Patent Litigation.  First, BrightEdge notified Searchmetrics of its intent to re-file overbroad discovery motions in the patent case to compel the production of (1) "all records of all communications with potential customers," (2) Searchmetrics' CRM database (which BrightEdge has repeatedly moved to compel in both the State Court Litigation and Patent Litigation), and (3) all versions of all Searchmetrics' source code.  Second, Searchmetrics has asserted that all of the patents are invalid because they claim unpatentable subject matter, and Searchmetrics seeks to file a motion for judgment on the pleadings on this ground as soon as possible as Searchmetrics believes that this motion could dispose the Patent Litigation in its entirety and result in massive reduction in litigation costs.  However, BrightEdge's position is that Searchmetrics may not file its motion until August 2017 yet BrightEdge expects to pursue its unduly burdensome and harassing discovery now.

67.    Since March of 2014, the Debtor has incurred over $6 million in attorneys' fees and costs defending the BE Litigation.  I anticipate that the Debtor will expend at least an additional $5 million in defending the BE Litigation, before appeals.  The Debtor was under threat of losing its funding source, GmbH, if the Debtor could not bring to an end the BE Litigation and stop the BE Litigation burn in the immediate term.

## IV.

## GOAL OF CHAPTER 11 CASE

68.    Through this Chapter 11 Case, the Debtor seeks to restructure its business, pay all obligations in full and estimate all claims asserted and that could have been asserted by BrightEdge so that the Debtor may successfully reorganize and operate unencumbered by the onus of the BE Litigation.  To that end, the Debtor filed a chapter 11 plan (the "**Plan**") on the Petition Date, which contains two alternatives.  Under the first alternative, the Debtor proposes to pay in full all allowed

claims (the "**Full Payout Plan**"), contingent upon the Court's estimation and determination that BrightEdge's claims in the aggregate do not exceed $250,000.00 (the "**BE Cap**"). Under the second alternative, if the Court estimates BrightEdge's claims in excess of the BE Cap, holders of allowed general unsecured claims will receive their pro rata share from a capped amount of cash provided by GmbH in order that GmbH may retain its interest in the Debtor (the "**New Value Plan**").

69.     As described above, the Debtor does not believe that BrightEdge has any valid claims against the Debtor, and has attributed zero value to the Patent Litigation and a nuisance value to the State Court Litigation. This Court should not condone the tactics that have been employed by BrightEdge in the BE Litigation. This Chapter 11 Case represents the only avenue to save the Debtor's business from liquidation at the hands of a chief competitor in the U.S. market, maintain its workforce, and become profitable.

70.     A critical component of saving the Debtor's business is the swift and global resolution, or estimation of, all of BrightEdge's claims against the Debtor. To achieve this goal, contemporaneously with the filing of this Declaration, the Debtor has initiated an adversary proceeding seeking, among other things, declaratory relief with respect to the claims asserted by BrightEdge in the BE Litigation, an objection to all claims asserted by BrightEdge in connection with the Chapter 11 Case, and a request to estimate BrightEdge's claims in the Chapter 11 Case for all purposes.

71.     Through the adversary proceeding, the Debtor will ask the Court first to estimate the BrightEdge claims relating to the State Court Litigation issues, assuming, but not determining, liability, and to consider the Debtor's *Alice* motion and then if necessary, a "prior use" motion concerning the issues raised in the Patent Litigation.

72.     It is my understanding that in June 2014, the U.S. Supreme Court issued its decision in *Alice v. CLS Bank*, which greatly narrowed the scope and validity of software patents. Approximately 70% of software patents challenged following *Alice* have been invalidated. Searchmetrics believes all five of the BrightEdge software patents at issue will be invalidated with an *Alice* motion, which Searchmetrics will file in the coming days and which can be heard as soon as the Court desires. Importantly, no discovery is needed as an *Alice* motion is similar to a motion for a judgement on the pleadings. If Searchmetrics' *Alice* motion is granted, the patent piece of the adversary proceeding would be done. The patent case was stayed in November 2014 before any *Alice* motion was filed. The stay was just lifted last week, but the court is permitting full blown discovery before the *Alice* motion will be considered, something that the Debtor feels continues/contributes the waste suffered by the Debtor through the BE Litigation.

73.     If the Court estimates the BrightEdge claims in an amount equal to or less than the BE Cap and determines no liability on the Patents-in-Suit (because not one of the Patents-in-Suit are valid or infringed), then the Debtor will proceed toward confirmation of the Plan under the Full Payout Plan.

74.     Alternatively, if the BrightEdge Claims are estimated in an amount in excess of the BE Cap, then the Debtor may seek a determination of liability then proceed with Plan confirmation, or proceed directly with Plan confirmation.

## V.

## RELIEF SOUGHT IN THE
## DEBTOR'S FIRST DAY PLEADINGS

**A.      Application for an Order Appointing JND Corporate Restructuring as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date ("Claims Agent Application").**

75.      Pursuant to the Claims Agent Application, the Debtor seeks entry of an order appointing JND Corporate Restructuring ("**JND**") as the Court-appointed claims and noticing agent for the Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's Chapter 11 Case.  Given the complexity of this Chapter 11 Case and the number of creditors and other parties in interest involved, I believe that appointing JND as the claims and noticing agent in this Chapter 11 Case will maximize the value of the Debtor's estate for all of its stakeholders.

**B.      Debtor's Motion to File Under Seal Portions of its Creditor Matrix Containing Certain Customer and Employee Information ("Matrix Motion").**

76.      Pursuant to the Matrix Motion, the Debtor seeks entry of an order (a) authorizing the Debtor to file a redacted version of the creditor matrix, (b) authorizing the Debtor to file under seal an unredacted version of the creditor matrix, and (c) granting such other and further relief as the Court deems just and proper.

77.      The Debtor believes that if its customers' names and contact information were publicly disclosed, competitors could use such information to try to lure away customers and compromise the Debtor's reorganizational efforts.  Additionally, the Debtor believes that publicly disclosing their employee's home addresses is unnecessary and may cause privacy concerns. Moreover, the Debtor believes that it is vitally important for the employees to focus their efforts towards facilitating a successful reorganization and not be concerned about their personal

residential addresses being published publicly as a result of this case. Accordingly, on behalf of the Debtor, I respectfully submit that the Matrix Motion should be approved.

**C.    Motion of the Debtor for Entry of Interim and Final Orders (A) Approving the Continued Use of the Debtor's Cash Management System, (B) Scheduling a Final Hearing on the Motion, and (C) Granting Related Relief ("Cash Management Motion").**

78.     Pursuant to the Cash Management Motion, the Debtor seeks entry of an order approving the Debtor's continued use of their company-wide cash management system (the "**Cash Management System**"), and granting related relief.

79.     Prior to the Petition Date, the Debtor employed a Cash Management System to efficiently collect, transfer, and disburse funds generated by its business operations. The Cash Management System facilitates the Debtor's cash forecasting and reporting as well as enables the Debtor to maintain control over the administration of its bank accounts (the "**Bank Accounts**") and to monitor and record the collection and disbursement of funds.

80.     Through the Bank Accounts, the Debtor efficiently collects, transfers, and disburses funds generated from its operations on a daily basis. The Debtor employs various methods to deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts, including checks, automated clearing house ("**ACH**") transactions, direct deposits, and electronic funds transfers. Although both of the Bank Accounts are the Debtor's operating accounts, the Debtor primarily utilizes its Bank Account at Commerzbank. Most of the outflow on accounts payable are made from this operating account, including for payroll via ACH and wire transfers. The "lockbox" attached to the Bank Account at Commerzbank is utilized to accept check payments from the Debtor's U.S. customers. The Debtor utilizes the Bank Account at HSBC primarily to run business-related credit card charges and secondarily to collect payments from its customers.

Receipts deposited into the Bank Account at HSBC are from time to time swept into the Bank Account at Commerzbank.

81.    The Debtor believes that the Bank Accounts are generally in a financially stable banking institution with the guaranteed deposit protection insurance. Further, with respect to the Bank Account held at HSBC, the Debtor believes that the Bank is recognized by the United States Trustee for Region 3 as an authorized depository for chapter 11 debtor in possession funds.

82.    The Debtor does not engage in intercompany cash management relationships for purposes of day-to-day operations. Except to the extent permitted under the DIP Facility, as this term is defined in the *Debtor's Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to Obtain Postpetition Secured Financing, (ii) Authorizing the Postpetition Use of Cash Collateral, (iii) Providing Super-Priority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Scheduling a Final Hearing, and (vi) Granting Related Relief*, the Debtor will not engage in any intercompany loans with its non-Debtor affiliate.

83.    I believe that the continuation of the Debtor's Cash Management System is essential to the Debtor's business, and that any disruption in the Debtor's use of the Cash Management System would severely disrupt the Debtor's businesses. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its businesses in chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

D.    **Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Wages, Compensation, and Maintain and Continue Employee Benefits and Programs in the Ordinary Course; (II) Authorizing the Continuing Employment of Sequoia by the Debtor in the Ordinary Course; (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations; and (IIV) Granting Related Relief ("Wages Motion").**

84.    Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders, (i) authorizing the Debtor to pay certain prepetition amounts owing to its employees related to wages, commissions, non-insider quarterly and yearly bonuses, employee programs, and other obligations, as discussed below ("**Prepetition Employee Obligations**"), and to continue certain employee benefits programs discussed below (the "**Employee Benefits Programs**"), (ii) authorizing the Debtor to pay amounts owing to its contractors related to wages and other obligations (the "**Prepetition Contractor Obligations**" and together with the Prepetition Employee Obligations, "**Prepetition Obligations**"), and (iii) authorizing financial institutions to process related checks and electronic transfers.

85.    As of the Petition Date, the Debtor's workforce in the United States is comprised of 38 employees (the "**Employees**"), of whom 37 are full-time employees and 1 is a part-time employee. Full-time Employees are normally scheduled to work at least 30 hours per week, and part-time employees are expected to work up to 30 hours per week. The Debtor supplements its workforce with independent contractors (collectively, the "**Contractors**"), who are typically employed to work on special projects for a short period of time on an as-needed basis. Currently, the Debtor employs 4 full time Contractors, each of whom work approximately 160 hours per month in the aggregate. The Employees and Contractors work in the five segments of the Debtor's business: Professional Services, Product Marketing, Marketing, Sales, and Administration, holding such positions as professional services managers, client success managers, strategic account managers, product marketing managers, sales development representatives, account

executives, online marketing managers, digital marketing managers, administrative support staff and other personnel, and SEO consultants. Employees and Contractors are located in several states across the United States, namely California, New York, Illinois, Texas, Georgia, and Colorado. None of the Debtor's Employees are represented by a union.

86.    The vast majority of Employees and Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and support their families, and will be exposed to significant financial constraints if the Debtor is not permitted to continue paying compensation, provide employee benefits, and maintain existing programs.

87.    The Debtor seeks to minimize the personal hardship the employees would suffer if employee obligations are not paid when due or as expected. The Debtor is seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, employee assistance, and other benefits that the Debtor has historically directly or indirectly provided to the employees in the ordinary course of business and as further described in the Wages Motion.

88.    Furthermore, the Debtor is seeking to maintain for its employees a Searchmetrics stock benefit that requires no cash payments and is a benefit triggered by a capital transaction involving the Searchmetrics group.

89.    I believe that the employees provide the Debtor with services essential to conduct the Debtor's business, and the Debtor believes that absent the payment of the employee

compensation and benefits owed to the employees, the Debtor will experience employee turnover and instability at this critical time. Additionally, I understand that a significant portion of the value of the Debtor's business is tied to their workforce, especially their sales team, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of this Chapter 11 Case. I therefore believe that payment of certain prepetition obligations with respect to the employee compensation and benefits is a necessary and critical element of the Debtor's efforts to preserve value and will give the Debtor's the greatest likelihood of retention of its employees as the Debtor seeks to operate its business in this Chapter 11 Case.

E.      **Motion of the Debtor for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services ("Utilities Motion").**

90.     Pursuant to the Utilities Motion, the Debtor seeks entry of interim and final orders (a) approving the Debtor's proposed form of adequate assurance of postpetition payment to the Utility Companies (defined therein) of a two week deposit for each Utility Company, (b) approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (defined therein), and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor solely on the basis of the commencement of this chapter 11 case, a debt that is owed by the Debtor for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance.

91.     In connection with the operation of its business, the Debtor obtains, among other things, electricity, equipment, heating and telephone and other similar services and other similar services from a number of utility companies. On average, the Debtor pays approximately

- 33 -

$11,000.00 each month for third party Utility Services, calculated based on the historical weekly average costs.[3]  None of the Utility Companies currently holds any deposit.

92.     Preserving Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtor's ability to continue operations.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtor's customer base, and ultimately, its revenues.  Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during this Chapter 11 Case.

**F.     Debtor's Motion for an Order Authorizing the Debtor to (i) Honor Certain Prepetition Obligations to Customers and (ii) Continue Customer Programs in the Ordinary Course of Business ("Customer Programs Motion").**

93.     Pursuant to the Customer Programs Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor, in its discretion, to maintain and administer the Customer Programs and honor the Customer Obligations in the ordinary course of business and in a manner consistent with past practice.

94.     Prior to the Petition Date, in the ordinary course of business, the Debtor engaged in certain marketing and sales practices designed to, among other things, drive sales, meet competitive pressures, build key relationships, and develop and sustain customer loyalty.  The Debtor sells its products directly to the Debtor's customers (the "**Customers**").  The Customer-targeted incentive programs (collectively, the "**Customer Programs**") are tailored to each of the

---

[3]   The Debtor maintains three (3) current leases.  Under the terms of the lease agreements (the "**Lease Agreements**"), the Debtor's Utilities are paid directly to the landlord.  Therefore, the Debtor does not make any direct payments to any Utility Company.  The Debtor intends to continue to remit these payments to the landlord in the ordinary course postpetition, consistent with the debtor in possession financing budget.

Debtor's primary types of Customer constituencies, and include, but are not limited to, those practices described in the following paragraphs.

95.    The Debtor maintains a discretionary discount program (the "**Discretionary Discount Program**") for certain of its Customers.  Each of the Debtor's sales representatives (the "**Sales Representatives**") may provide individual discretionary pricing discounts (collectively, the "**Discounts**") according to a fixed price list.  Each discount is limited in duration and scope (collectively, the "**Discount Terms**") and often reflected in each individual Customer's agreement for services and products.  Accordingly, the Debtor reduces the amount of the Customer's invoice according to the Discount Terms.  The Discount Program allows the Sales Representatives to show appreciation for valued Customers, reinforce Customer relationships, and entice new customers to use the Debtor's services.  As of the Petition Date, the Debtor believes that all Discounts have been applied.  However, out of an abundance of caution the Debtor seeks authorization to honor any unapplied Discounts that accrued prior to the Petition Date in a matter consistent with the Discount Terms and its ordinary business practices.  To preserve the goodwill and loyalty of existing Customers, and to continue to attract new customers, the Debtor seeks further authorization to continue to administer the Discount Program in the ordinary course of business.

96.    The Debtor implemented the Customer Programs to encourage the Debtor's customers to increase purchasing frequency and volume, resulting in larger net revenues for the Debtor, and to preserve and enhance the reputation of the Debtor and its products.  In turn, Customers rely on the Debtor to fulfill its obligations under the Customer Programs (the "**Customer Obligations**").  The Debtor, thus, believes that honoring the Customer Programs is essential to retaining its Customer base and maintaining its reputation in its industry.  Moreover, the Customer Programs generally represent practices that are common in the industry and,

therefore, if the Debtor does not continue the Customer Programs, it will be at a disadvantage in a competitive marketplace.  I believe that it is critically important to the Debtor's business' long-term viability that they maintain the loyalty and trust of its Customers and preserve its brand image and reputation, particularly while operating in chapter 11.

97.    The Debtor must be able to assure its Customers and send a strong message to the marketplace that they are willing and able to honor its prepetition obligations to Customers and will continue to maintain and develop as well as to implement and administer its Customer Programs in the ordinary course of business consistent with its existing practices.  The Debtor submits that an order authorizing it to continue the Customer Programs as they determine to be appropriate, to honor, in its discretion, the Customer Obligations arising prior to the Petition Date.

98.    I believe that continuing the Customer Programs without interruption is vital to the Debtor's business, facilitating a smooth transition into chapter 11 and enhancing the prospect of success of this case.  The Debtor's Customer Programs are standard practice in its industry, and customers expect to participate in these types of programs.  The Debtor's inability to honor its Customer Programs would place it at a sharp disadvantage to its competitors, at a time when it can least afford it.  At this critical juncture, the Debtor cannot risk any loss of Customer support, confidence, or development as a result of the Debtor's failure to honor Customer Obligations.  The Debtor believes that the requested relief will advance the restructuring of its business, both in terms of profitability and the engendering of goodwill with essential Customers, especially at this critical time early in this case.  There is no cash outlay to maintain the Customer Programs.  Instead, honoring the Customer Obligations stands only to generate revenue, such that the Customer Programs should remain in place.

G.    **Motion of the Debtor for Entry of an Order Authorizing the Debtor to Continue Its Insurance Policies and Pay Prepetition and Postpetition Obligations in Respect Thereof ("Insurance Motion").**

99.    Pursuant to the Insurance Motion, the Debtor seeks entry of an order authorizing it to continue their insurance policies and pay prepetition and ongoing, ordinary course postpetition obligations in respect thereof, and also authorizing the Debtor's financial institutions to honor and process checks and transfers related to such insurance obligations.

100.    In the ordinary course of business, the Debtor maintains several insurance programs that provide coverage for, among other things, commercial general liability, automobile liability, property damage, ID fraud, cyber risk, professional liability, and director and officer liability (collectively, the "**Insurance Programs**"), which the Debtor has obtained through third-party insurance carriers (collectively, the "**Insurance Carriers**").  As part of its Insurance Programs, the Debtor also maintains a workers' compensation policy.  All of the Insurance Programs are essential to the ongoing operations of the Debtor's business and the preservation of the value of the Debtor, and most of the Insurance Programs are required by laws and regulations, governing in the jurisdictions in which the Debtor does business, as well as by agreements to which the Debtor is a party.

101.    By the Insurance Motion, the Debtor seeks authority to pay $10,000.00 on account of outstanding prepetition obligations and to continue honoring any amounts on account of the foregoing in the ordinary course of business to ensure uninterrupted coverage under its Insurance Policies.

102.    Continuation and renewal of the Insurance Policies and entry into new insurance policies, as necessary, is essential to preserving the value of the Debtor's business and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtor's commercial activities, including the

requirements of the U.S. Trustee. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

**H.      Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Taxes ("Taxes Motion").**

103.    The Taxes Motion seeks the authority to remit and pay taxes and fees that accrued before the Petition Date and will become payable during the pendency of this case in an aggregate amount not to exceed $25,000.00. The Debtor also requests that the Court authorize applicable financial institutions, when the Debtor so requests, to receive, process, honor and pay any and all checks or electronic payment requests in respect of such taxes and fees.

104.    In the ordinary course of business, the Debtor incurs several types of taxes, including property, franchise, business, sales, and capital base tax liabilities, all more fully described in the Taxes Motion. I believe that the relief requested in the Taxes Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Taxes Motion should be approved.

**I.      Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Secured Financing, (II) Authorizing Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief ("DIP Motion").**

105.    By the DIP Motion, the Debtor requests the entry of an Interim Order and a Final Order, among other things, (a) authorizing the Debtor to enter into the DIP Facility, a senior secured postpetition financing consisting of a multi-draw term loan in the principal amount of up to €4,325,000, consistent with the terms and conditions of the Prepetition Secured Debt Facility, the Reaffirmation Agreement, the DIP Term Sheet, and the DIP Budget (the "**DIP Facility**

**Amount**"), which DIP Facility Amount includes the amount necessary to repay the Prepetition Secured Obligations (as defined in the DIP Motion) upon entry of the Final Order; (b) authorization for the Debtor to execute and deliver any additional necessary documents in connection with the Prepetition Secured Debt Facility, the Reaffirmation Agreement, and DIP Term Sheet and to perform such other and further acts as may be necessary or appropriate in connection therewith; (c) authorization for the Debtor to obtain from DIP Lender, during the interim period pending a final hearing on the Motion as required by Bankruptcy Rule 4001 (the "**Final Hearing**"), an Advance in the amount not to exceed a maximum outstanding principal amount of €500,000 (the "**Interim Amount**") in accordance with the DIP Budget and the Interim Order; (d) upon the Final Hearing on the relief requested in the Motion and entry of the Final Order, authorization for the Debtor to use amounts under the DIP Facility to repay in full outstanding indebtedness in the amount of €1,429,406 (the "**Prepetition Secured Obligations**") owed to the Prepetition Lender, as provided in the DIP Term Sheet, with such amount constituting an obligation under the DIP Facility; (e) authorization for the Debtor to grant to DIP Lender assurances for the full and timely payment of the Debtor's obligations under the DIP Facility by granting to the DIP Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "**Superpriority Administrative Expense Claim**"), having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined below), and (ii) pursuant to section 364(c)(2)-(3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the Collateral (as defined below), subject only to the Carveout and Permitted Liens (as defined in the Prepetition Secured Debt Facility); (f) authorization to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**")

and the proceeds of the DIP Facility in accordance with the DIP Budget in form and substance satisfactory to the DIP Lender, including to fund the costs associated with the Debtor's chapter 11 case, and achieve a resolution of the BE Litigation, to fund postpetition operating expenses of the Debtor during the chapter 11 case, and to repay the Prepetition Secured Obligations; (g) pursuant to sections 361 and 363 of the Bankruptcy Code, authorization to grant adequate protection to the Prepetition Lender; (h) pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent necessary; (i) pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on the Motion and obtain authorization, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the Prepetition Secured Debt Facility and DIP Term Sheet and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate; and (j) pursuant to Bankruptcy Rule 4001, to schedule a final hearing on the Motion to consider entry of the Final Order, authorizing the Debtor to borrow the remaining available balance of the DIP Facility on a final basis on the terms and conditions set forth in the Prepetition Secured Debt Facility and DIP Term Sheet.

106.    The DIP Facility consists of a multi-draw term loan in the amount of up to €4,325,000, consistent with the terms of the Prepetition Secured Facility, the DIP Term Sheet, and the budget (the "**DIP Budget**"), all of which are attached as exhibits to the DIP Motion. The proceeds of the DIP Facility will be used to pay operating expenses and the costs and expenses of administering this Chapter 11 Case subject to and in accordance with the DIP Budget.

107.    The DIP Facility will bear interest at a rate of five percent (5.00%) per annum, which interest shall be paid in cash monthly and upon any repayment or prepayment of principal. The DIP Facility provides for a termination fee of two percent (2.00%), which is earned the later of the sale of substantially all of the Debtor's assets or confirmation of a chapter 11 plan to which

the DIP Lender objects.  The DIP Term Sheet also incorporates the milestones incorporated into the Forbearance Agreement and the Prepetition Secured Facility.

108.    In the ordinary course of business, the Debtor requires cash on hand and cash flow from its operations, supplemented by Advances under the Prepetition Secured Debt Facility to fund its liquidity needs and operate its business.  For the past three years, the Debtor has also required cash on hand and cash advances in the form of unsecured loans to defend the BE Litigation.  In addition, the Debtor requires access to sufficient liquidity to fund this Chapter 11 Case while working towards confirmation of a plan of reorganization.  Postpetition financing is necessary in order for the Debtor to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers postpetition, and fund working capital needs.  Absent postpetition financing, the Debtor will be forced to wind-down its business operations due to a lack of funds.

109.    In light of the fact that the Debtor has never been cash flow positive and that it is a named defendant in two sets of litigation initiated by its chief competitor in the U.S. market, the Debtor did not believe that it could reasonably expect to engage a third-party lender to help the Debtor accomplish its goal of emerging from this Chapter 11 Case.  I believe that the DIP Facility provided the only viable funding option available to the Debtor, and I believe that it is imperative that the Debtor has access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a chapter 11 plan.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and current to the best of my knowledge and belief.

Dated: May 8, 2017

By:    Wayne P. Weitz
Title:    Chief Restructuring Officer